**Electronically Filed
Intermediate Court of Appeals
CAAP-13-0000224
28-MAR-2014
10:28 AM**

NO. CAAP-13-0000224

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I


STATE OF HAWAI'I, Plaintiff-Appellee, v.
JULIA CATHRYN BROUGHTON, Defendant-Appellant


APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CRIMINAL NO. 11-1-0940)


SUMMARY DISPOSITION ORDER
(By:  Foley, Presiding Judge, Fujise and Leonard, JJ.)

Defendant-Appellant Julia Cathryn Broughton (**Broughton**) appeals from a February 20, 2013 Judgment of Conviction and Sentence (**Judgment**), which was entered by the Circuit Court of the First Circuit (**Circuit Court**).[1]  After a jury-waived trial, the Circuit Court convicted Broughton of Assault in the Second Degree, in violation of Hawaii Revised Statutes (**HRS**) § 707-711(1)(g) (Supp. 2013).

Broughton raises two points of error on appeal:  (1) Broughton's conviction must be reversed where there was no substantial evidence to support the Circuit Court's conclusion that the defense had failed to prove her affirmative defense of physical or mental disease, disorder, or defect by a preponderance of the evidence; and (2) Broughton's conviction must be vacated where the Circuit Court's verdicts acquitting her in CR No. 11-1-0882 and convicting her in this case were irreconcilably inconsistent.

---

[1]     The Honorable Richard K. Perkins presided.

Upon careful review of the record and the briefs submitted by the parties and having given due consideration to the arguments advanced, applicable authorities, and the issues raised by the parties, we resolve Broughton's points of error as follows:

(1) Broughton was convicted of Assault in the Second Degree, in violation of HRS § 707-711(1)(g) (Supp. 2013),[2] which provides in relevant part:

> **Assault in the second degree.** (1) A person commits the offense of assault in the second degree if:
>
> . . . .
>
> (g) The person intentionally or knowingly causes bodily injury to a person employed at a state-operated or -contracted mental health facility. For the purposes of this paragraph, "a person employed at a state-operated or -contracted mental health facility" includes health care professionals as defined in section 451D-2, administrators, orderlies, security personnel, volunteers, and any other person who is engaged in the performance of a duty at a state-operated or -contracted mental health facility.

In conjunction with her first point of error, Broughton argues that, as a result of her mental disease, disorder, or defect, she did not possess the requisite state of mind for commission of the charged offense, as well as that she proved the affirmative defense of physical or mental disease, disorder, or defect excluding penal responsibility, by a preponderance of the evidence.

Pursuant to HRS § 704-400 (1993):

> **§ 704-400 Physical or mental disease, disorder, or defect excluding penal responsibility.** (1) A person is not responsible, under this Code, for conduct if at the time of the conduct as a result of physical or mental disease, disorder, or defect the person lacks substantial capacity either to appreciate the wrongfulness of the person's conduct or to conform the person's conduct to the requirements of law.
>
> (2) As used in this chapter, the terms "physical or mental disease, disorder, or defect" do not include an

---

[2] Broughton's charged offense was committed on May 15, 2009. Subsequently, HRS § 707-711 was amended in 2010 and 2011. However, none of the changes substantively affect the section of the statute with which Broughton was charged.

abnormality manifested only by repeated penal or otherwise anti-social conduct.

As noted by Broughton, evidence of physical or mental disease may negate the state of mind that is required to establish an element of the charged offense. Specifically, HRS § 704-401 (Supp. 2013) provides:

> **§ 704-401 Evidence of physical or mental disease, disorder, or defect admissible when relevant to state of mind.** Evidence that the defendant was affected by a physical or mental disease, disorder, or defect is admissible whenever it is relevant to prove that the defendant did or did not have a state of mind that is required to establish an element of the offense.

Pursuant to HRS § 704-402(1) (1993), "[p]hysical or mental disease, disorder, or defect excluding penal responsibility is an affirmative defense[.]" Thus, pursuant to HRS § 701-115(2)(b) (1993),

> the defendant is entitled to an acquittal if the trier of fact finds that the evidence, when considered in light of any contrary prosecution evidence, proves by a preponderance of the evidence the specified fact or facts which negative penal liability.

Here, with respect to the conviction that is on appeal, as well as the acquittal of Broughton on a charge stemming from a separate incident that occurred approximately eighteen months later, the Circuit Court determined:

> Absent a defense, the defendant would have been proved guilty of the offense charged in each criminal number, specifically I find following beyond a reasonable doubt:
> That in Criminal Number 11-1-0882, on or about November 30th, 2010, on the island of Oahu, State of Hawaiʻi, Defendant Julia Broughton intentionally and knowingly caused bodily injury to Manielyn Racuna [**Racuna**], who was at that time employed at the Hawaiʻi State Hospital, a State-operated mental health facility;
> And that in Criminal Number 11-1-0940, on or about May 15th, 2009, on the island of Oahu, State of Hawaiʻi, Defendant Julia Broughton intentionally and -- and knowingly caused bodily injury to Doctor Anne [Virnig[3]], who was at that time employed at the Hawaiʻi State Hospital, a State-operated mental health facility.
> In both criminal numbers the defendant relies on the defense of physical or mental disease, disorder or defect excluding penal responsibility. This is an affirmative defense that the defendant must prove by a preponderance of

---

[3] Please note that Dr. Anne Virnig's last name was misspelled in the Transcript of Proceedings dated August 22, 2012, but has been edited herein to reflect the correct spelling.

the evidence. The diagnoses of the defendant given by each of the three examiners appointed by the Court in this case included both Post-Traumatic Stress Disorder and borderline personality disorder. The evidence indicates that the defendant's borderline personality disorder would not substantially impair her ability to appreciate the wrongfulness of her conduct or to conform her conduct to the requirements of law in the absence of extreme stress.

I am unable to find that sort of stress in the evidence relevant to the assault on Doctor Virnig. The defendant was calm and coherent for the most part while participating in the video conference with Judge August up to the point when she realized that the judge would not order the transfer that she wanted, stood and attacked Doctor Virnig.

Doctor Westfall [sic], who was on the scene immediately after the assault while the defendant was still struggling with hospital staff, did not notice any signs of depression or psychosis or observe the defendant to be responding to internal stimuli. Also, the defendant, rather than randomly selecting a victim, chose to assault Doctor Virnig in particular. Doctor Virnig was not the person situated closest to the defendant in the video room at the time of the assault. The defendant told staff shortly after the assault that Doctor Virnig deserved it and the doctor, days before, had refused to prescribe the medication the defendant wanted.

As to the incident involving Manielyn Racuna, the evidence indicates that prior to the assault the defendant was agitated and hypervigilant, in Nurse Ganotisi's words, quote, "not at her normal baseline," end quote. This was in the cafeteria. There is no credible evidence to explain with any certainty why the defendant was in such a state.

While she was asked by Ganotisi to go to building A, she turned and walked in the opposite direction. Hospital staff prevented her from leaving by surrounding her, then accompanied her without any physical restraint to building A. On the way the defendant remained in an agitated state, posturing towards staff and threatening to break past promises and hit someone but not actually attacking anyone.

In the quiet room, Manielyn Racuna picked up a chair and walked to the doorway, turned back into the room and saw the defendant lunge toward her. Interpreting that move as an attack rather than what might have been an attempt by the defendant to leave the quiet room, Racuna raised the chair to block the defendant. At that point staff grabbed the defendant and pushed her against the wall, she struggled and they took her down to the floor. It was then that the defendant grabbed Racuna's hair and pulled it. The defendant was eventually placed in a restraint chair but remained for some time in an angry and agitated state.

I find credible Doctor Altman's testimony to the effect that the physical force used by hospital staff to restrain the defendant triggered Post-Traumatic Stress Disorder, which exacerbated the borderline personality disorder to the extent that the defendant's ability to appreciate the wrongfulness of her conduct, specifically pulling Nurse Racuna's hair -- oh, I'm sorry, pulling Manielyn Racuna's hair, and to conform that conduct to the requirements of the law were substantially impaired.

So as to Criminal Number 11-1-0882 involving Manielyn Racuna, the Court finds by a preponderance of the evidence that at the time of the assault on Nurse Racuna, as a result of physical or mental disease, disorder or defect, the defendant lacked substantial capacity to both appreciate the

4

wrongfulness of her conduct and to conform her conduct to the requirements of the law.

The Court further finds, based upon the evidence presented at trial, that the defendant does present a risk of danger to herself and others and that the defendant is not a proper subject for conditional release at this time. Therefore, the defendant is ordered committed to the custody of the Director of Health to be placed in an appropriate institution for custody, care and treatment. She's acquitted in that case.

As to Criminal Number 11-1-0940 involving Doctor Virnig, the Court finds the defendant guilty as charged.

The Hawai'i appellate courts review the sufficiency of the evidence as follows:

We have long held that evidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction; the same standard applies whether the case was before a judge or a jury. The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact. Indeed, even if it could be said in a bench trial that the conviction is against the weight of the evidence, as long as there is substantial evidence to support the requisite findings for conviction, the trial court will be affirmed.

Substantial evidence as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion. And as trier of fact, the trial judge is free to make all reasonable and rational inferences under the facts in evidence, including circumstantial evidence.

State v. Matavale, 115 Hawai'i 149, 157-58, 166 P.3d 322, 330-31 (2007) (citation, internal quotation marks, and brackets omitted; format altered).

Regarding the issue of penal responsibility, in the Circuit Court proceedings, "[o]nce evidence [of the affirmative defense] is introduced on this issue, the prosecution is required to prove the responsibility of the defendant beyond a reasonable doubt." HRS § 704-402(1) (1993) commentary; see also HRS § 701-114 (1993). On appeal, "[t]he trial court's finding that [the defendant] was penally responsible will be affirmed as long as there was substantial evidence to support it." State v. Young, 93 Hawai'i 224, 231, 999 P.2d 230, 237 (2000) (citations omitted).

Here, the State adduced substantial evidence with respect to Broughton's mental state at the time of the charged

5

offense to support the Circuit Court's conviction of Broughton. Dr. Virnig testified that Broughton's mannerism "was very controlled, very much purposeful." Jamie Roman, the Hospital social worker who was present during the incident, also testified that Broughton "appeared calm . . . [and] clear-minded" at the hearing on May 15, 2009.

On direct examination, Dr. Altman opined that Broughton's penal responsibility was "substantially impaired" at the time of the incident, he attributed the impairment to "polysubstance abuse," "borderline disorder probably exacerbated by a psychostimulant psychotic disorder where she usually hears voices and has paranoia," as well as "the borderline disorder itself, which clearly the medications at the time were -- were not working." However, Dr. Altman was asked during cross-examination, "when she attacked Dr. Virnig, [whether Broughton] knew she was going after Dr. Virnig." Dr. Altman responded, "I believe she did."

Dr. Gitter opined that Broughton's "cognitive and volitional capacities at the time of the alleged two assaults were not substantially impaired as a result of her mental disorders." Dr. Gitter thoroughly supported his opinion as follows:

> This opinion is based on my review of the police reports as well as the progress notes in the defendant's Hawaii State Hospital inpatient record.
>
> Regarding the defendant's alleged assault of Dr. Virnig on May 15, 2009, the progress notes document that already one day prior to the alleged offense the defendant had behaved in an agitated, aggressive and combative manner towards staff and had also been threatening to the point where she required four point restraints. She was released from restraints three and half hours later at which time she was cooperative and able to contract for safety. Apparently, she had been upset about having been placed on phone restrictions due to the fact that she had destroyed a telephone.
>
> In the morning of May 15, 2009, i.e. prior to the video conference, Ms. Broughton was noted to be quite demanding. She became loud, agitated and pounded the plexiglas window at the nurse's station. During the video conference at approximately 11:40 a.m., she became agitated and upset with Judge August on Maui as well as with the treatment team members. Since the judge denied her request to be transferred back to a different unit at Hawaii State Hospital, she became very angry and then suddenly assaulted

> Dr. Virnig. After she had been subdued and she made the spontaneous statement, "she, i.e. Dr. Virnig deserved it."
>
> The progress notes also reveal that one day after the instant offense the defendant apologized to Dr. Virnig for her behavior and indicated that she had assaulted other people in the past or acted in other inappropriate manners and "that she does not wish to continue doing this." She was noted to be nonpsychotic at the time of the alleged offense as well the day afterwards when she apologized to Dr. Virnig.
>
> Regarding the defendant's assault on Ms. Marielyn Recuna, a twenty-four year old female, on November 30, 2010, the progress notes in the defendant's Hawaii State Hospital inpatient record reflect that prior to the assault she had become agitated. However, she walked voluntarily to the quiet area "but was still verbally threatening." She said "all those promises I made that I wouldn't hurt you guys, are off. I'm going to knock her block off." A late entry from November 29, 2010, i.e. one day prior to the alleged instant assault indicates that the defendant was very unhappy with being housed on Unit E and that she wanted to return to Unit H. She told staff "that it took hitting someone to go to H that's what she would do."

Other evidence from the three-member panel, which weighs against the Circuit Court's finding of penal responsibility, was provided by Dr. Wade, who opined that "at the time of the alleged conduct, [Broughton's] capacity to appreciate the wrongfulness of her conduct and conform her conduct to the requirements of the law were probably substantially impaired by a mental disease, disorder, or defect." Dr. Wade's primary diagnosis of Broughton was PTSD, but he also noted that Broughton was suffering from borderline personality disorder "at the time of the alleged offenses."

With respect to the PTSD diagnosis, Dr. Wade attributes the condition to the fact that Broughton

> was molested by two different people when she was five. One of those people molested [Broughton] for like a couple of years. She was raped when she was around 13 or 14. She was the victim of domestic violence that was so bad that she's got hearing loss in both her ears.

Dr. Wade described the symptoms and effects of PTSD as:

> Symptoms include heightened arousal. So you have somebody who is anxious. You're likely to see that by them making various kinds of movements. They have exaggerated startle responses. They're hypervigilant. They're scanning their environment, things like that. They're also likely to be irritable and have outbursts of anger. Likely have trouble sleeping. They have episodes where they -- it seems like they're reexperiencing what happened to them.

> Things that trigger this off can be situations that either symbolize or resemble the original traumatic event. So something that seems like it might be threatening to them in some fashion like she gets nervous when people make fast movements around her, especially men.
>
> And then you have a variety of other things that involve people, like losing interest in things that they liked to do before, or they have more difficulty forming relationships. They tend to be more distant. Various kinds of emotional instability too.

However, as noted by the Circuit Court, there is no evidence in the record of the occurrence of any triggers that would cause the recurrence of PTSD. Rather, it appeared that Broughton was calm and coherent, but chose to assault Dr. Virnig because Dr. Virnig had just testified regarding why she had denied Broughton's request to be transferred to a different hospital unit, and, just days before that, Dr. Virnig had refused to prescribe the medication that Broughton wanted. Furthermore, it is not the role of the appellate court to weigh credibility or resolve conflicting evidence. State v. Eastman, 81 Hawai'i 131, 139, 913 P.2d 57, 65 (1996).

Finally, the Circuit Court's finding of penal responsibility is supported by the testimony of Drs. Westphal and Booher. Dr. Westphal testified that, when he arrived on the scene on May 15, 2009, Broughton was not responding to internal stimuli and "more than alert." Overall, Dr. Westphal opined that "most borderline personality disorders have as good control over [the ability to think or act] as we do, as people without [borderline personality disorder]." Additionally, Dr. Booher, as a qualified expert witness and acting director of the Hospital, also testified that generally, Broughton "had control" of how she was thinking and how she was acting.

Thus, although there was contrary testimony, based upon the totality of the testimony presented, we conclude that there was sufficient evidence to support the Circuit Court's ruling that the prosecution had proven beyond a reasonable doubt that Broughton was penally responsible and acted with the requisite intent to be convicted of Assault in the Second Degree.

(2) In her second point of error, Broughton challenges her conviction as being irreconcilably inconsistent with her

acquittal in Cr. No. 11-1-0882, for the assault of Racuna. Specifically, Broughton argues that the Circuit Court acquitted her of Assault in the Second Degree with respect to the November 30, 2010 incident with Racuna, but convicted her of the May 15, 2009 incident with Dr. Virnig while she "had the same diagnoses" for both incidents.

As a general proposition, "inconsistent verdicts are not per se grounds for reversal." Briones v. State, 74 Haw. 442, 474, 848 P.2d 966, 981 (1993) (Levinsin, J., concurring) (citing State v. Liuafi, 1 Haw. App. 625, 643, 623 P.2d 1271, 1282 (1981)). As previously indicated:

> a conflict in the jury's answers to questions in a special verdict will warrant a new trial only if those answers are irreconcilably inconsistent, and the verdict will not be disturbed if the answers can be reconciled under any theory . . . . When faced with a claim that the verdicts are inconsistent, the court must search for a reasonable way to read the verdicts as expressing a coherent view of the case, and must exhaust this effort before it is free to dismiss the jury's verdict and remand the case for a new trial.

Shanghai Inv. Co., Inc. v. Alteka Co., Ltd., 92 Hawai'i 482, 496-97, 993 P.2d 516, 530-31 (2000) (citation and brackets omitted; ellipsis in original); see also Harris v. Rivera, 454 U.S. 339, 346-47 (1981) (holding that, like the deference given to inconsistent jury verdicts, apparent inconsistency in the trial judge's verdict in a non-jury criminal trial does not give rise to "inference of irregularity in his finding of guilt that is sufficiently strong to overcome well-established presumption that the judge adhered to basic rules of procedure").

Here, as set forth above, the Circuit Court provided its rationale for the difference in the court's determination regarding Broughton's penal responsibility in the two cases.

This rationale is supported by the record. Dr. Altman testified that borderline personality disorder is characterized by "unstable moods, which are mood swings from hypermania to depression," and that "the mood swings are shorter and tend to be very stress related. And they can shift rapidly. A person can be very psychotic today and tomorrow they can reconstitute and be quite stable." Similarly, as indicated above, Dr. Gitter opined

that Broughton was penally responsible for the incident with Dr. Virnig, as well as the later incident with Racuna. To support this conclusion, he opined that

> . . . if a person is under severe stress in a borderline personality disorder, he or she might become psychotic or temper briefly or engage in some kind of dissociative behavior. That did not occur.
> I went to the hospital. I reviewed her medical record, the progress notes from the time of the alleged offense just before and after, and they very clearly state that she was not psychotic.

Dr. Gitter further noted that, after the incident, Broughton apologized to Dr. Virnig, "which certainly leads me to believe that she knows right from wrong and she's of normal intellectual functioning . . . . it's not like saying, Oh, my God, I don't know how I did this, how this happened. But it was volitional in my opinion." While the Circuit Court did not adopt Dr. Gitter's opinion with respect to the Racuna incident, it was not unreasonable for the court to find that the prosecution had not met its burden as to the Racuna incident, but had met its burden with respect to the alleged assault on Dr. Virnig, in light of the different circumstances of the two events. Finally, this conclusion of penal responsibility with respect to the May 15, 2009 incident was supported by Drs. Westphal and Booher, who both treated Broughton during her time in the Hospital.

Dr. Altman testified that, with respect to the attack on Racuna, Broughton "most likely was experiencing at least a partial flashback, and at that point the person is both in the present and in the past . . . [but] with Dr. Virnig I don't believe she was experiencing any flashback or confusing her with anyone else." Specifically, according to Dr. Altman, Broughton said that she felt like she was being restrained during the incident with Racuna, which "sets her off." Dr. Altman explained that the situation in the quiet room was different from the situation with Dr. Virnig because there was "[p]robably an element of claustrophobia just being in there. There is with her a paranoia that she's going to be restrained. And if there are staff, especially male staff coming in and attempting to restrain her, I believe that sets off the PTSD."

Dr. Altman also stated:

> PTSD is a condition that's induced by exposure to a severe trauma that's life threatening or threatens the integrity of the person. In Ms. Broughton's case, that trauma was sexual abuse from her mother's boyfriend when she was ages 4 to 6, was being raped when she was 13, and severe physical abuse from an ex-boyfriend from ages 19 to 22 which involved <u>being held down and choked, being locked in a closet repeatedly</u>, and then he would come in and make like he was strangling her and boxing her on the ears, which -- repeatedly, which resulted in severe hearing loss to the extent that she needs to wear hearing aids to hear normal conversation. So that's the trauma.
>
> And the symptoms are nightmares, which she has, being chased and held down and raped and beaten, flashbacks which are triggered by situations resembling the original trauma.

(Emphasis added.) Based upon this evidence, it would be reasonable for the Circuit Court to infer that the stress of being locked in the quiet room would result in flashbacks of the initial trauma of being locked in a closet, which triggered her PTSD.

This reasoning is supported by Dr. Wade, whose primary diagnosis of Broughton was also PTSD, and he also noted that PTSD could be triggered by "situations that either symbolize or resemble the original traumatic event."

For these reasons, the verdicts in these two cases are not irreconcilably inconsistent. For the incident with Dr. Virnig, there is substantial evidence to support the Circuit Court's finding that there was no stress-induced psychosis for Broughton's borderline personality disorder, and that PTSD was also not triggered. For the incident with Racuna, there is also substantial evidence in the record to support the Circuit Court's finding that Broughton's PTSD was triggered, which exacerbated the borderline personality disorder to the extent that she was not able to appreciate the wrongfulness of her conduct. Having reconciled the verdicts under this theory of the cases, this Court will not disturb the conviction in this case. See Shanghai Inv. Co., Inc., 92 Hawaiʻi at 496-97, 993 P.2d at 530-31.

For these reasons, the Circuit Court's February 20, 2013 Judgment of Conviction and Sentence is affirmed.

DATED: Honolulu, Hawaiʻi March 28, 2014.

On the briefs:

Thomas R. Waters
for Defendant-Appellant

Sonja P. McCullen
Deputy Prosecuting Attorney
City and County of Honolulu
for Plaintiff-Appellee

Presiding Judge

Associate Judge

Associate Judge

12